1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  STEVEN VLASICH,                          CASE NO. CV-F-03-6014 OWW SMS HC

12              Petitioner,                  REPORT AND RECOMMENDATION____
                                             REGARDING PETITION FOR WRIT OF
13       vs.                                 HABEAS CORPUS

14  A.K. SCRIBNER,                           [Doc. 1]

15              Respondent.
    _____/

16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18  to 28 U.S.C. § 2254.

19                            PROCEDURAL BACKGROUND

20        On December 10, 1999, Petitioner was convicted in the Kings County Superior Court of

21  assault by a state prisoner with an enhancement for great bodily injury.  It was also found true that

22  Petitioner suffered prior convictions.  Petitioner was sentenced to an aggregate term of 21 years in

23  state prison.

24        Petitioner timely filed a notice of appeal in the California Court of Appeal, Fifth Appellate

25  District.  On November 14, 2001, the Court of Appeal affirmed the judgment.

26        On December 17, 2001, Petitioner filed a petition for review with the California Supreme

27  Court.  The petition was denied on January 23, 2002.

28  ///

                                        1

1      On April 9, 2001, Petitioner filed a petition for writ of habeas corpus with the Kings County

2 Superior Court.  The petition was denied on April 19, 2001.

3      On September 9, 2003, Petitioner filed a second petition for writ of habeas corpus with the

4 Kings County Superior court.  That petition was denied on September 12, 2002.

5      On October 23, 2002, Petitioner filed a petition for writ of habeas corpus with the California

6 Supreme Court.  The petition was denied on July 9, 2003.

7      On April 24, 2003, Petitioner filed a supplemental petition for writ of habeas corpus with the

8 California Supreme Court.  That petition was also denied on July 9, 2003.

9      Petitioner filed the instant federal petition for writ of habeas corpus on July 28, 2003.

10      By order of September 18, 2003, the Court directed Respondent to file a response to the

11 petition.  On December 10, 2003, Respondent filed an answer to the petition.  On January 9, 2004,

12 Petitioner filed a traverse.

13      On January 31, 2005, Petitioner filed a request for judicial notice.  By order of March 9,

14 2005, the Court construed Petitioner's request as a supplement to his traverse and directed

15 Respondent to file a response.  (Court Doc. 24.)  On April 7, 2005, Respondent filed a supplemental

16 response.

17 <u>STATEMENT OF FACTS</u>

18 <u>Prosecution</u>

19      On March 5, 1998, at Corcoran State Prison, inmate Scott Petty, was slashed and stabbed

20 during morning exercise on prison yard 4-B-2 yard.  (RT 41-42, 50-52.)  Yard 4-B-2 right wing was

21 triangular in shape and approximately twenty yards long, with a sink and toilet, equipped with a

22 push-button flush.  (RT 43-44.)  About three feet from the toilet was a yard drain, covered by a

23 grating about two feet square.  (RT 44.)

24      Correctional Officer Munoz was yard observation officer on that day for 4-B-2 yard.   Munoz

25 sat 10 feet above the yard and was armed with pepper spray, a rifle, and a .37 millimeter launcher

26 capable of firing wooden blocks.  (RT 41-43, 49-50.)

27      Prior to the assault inmate Petty was watching a handball game while Anderton, Sprout, and

28 Petitioner were seated in the area of a checker board.  (RT 48, 50.)  Sprout got up, walked about six

1  feet, and stood approximately six feet to Petty's right.  (RT 50.)  Petitioner then got up and

2  approached Petty on the left.  (RT 50.)  Petitioner then went up behind Petty, reached his right hand

3  over Petty's shoulder, and made slashing motions toward Petty.  (RT 50-51.)  Sprout closed in on

4  Petty and made a stabbing motion.  It appeared that Sprout had something in his hand.  (RT 51.)

5  Petty attempted to defend himself.  (RT 52.)  Petitioner continued to make slashing and punching

6  motions, and when Petty fell to the ground, he made kicking motions as well.  (RT 52.)  Sprout

7  continued to make a few stabbing motions, then moved about 6 or 7 feet away in the direction of the

8  toilet.  (RT 52.)  Sprout stopped and turned and saw that Petty and Petitioner were still grappling,

9  and returned to make a couple more stabbing motions.  (RT 52.)  Then Sprout went to the toilet area,

10  and dropped something in the toilet and flushed it several times.  (RT 52-53.)

11  During the altercation, officer Munoz was ordering the combatants and everyone on the yard

12  to get down on the ground.  (RT 53, 103.)  Everyone, except the combatants, got down on the

13  ground, therefore, he fired the .37 millimeter with the wooden baton rounds three times.  (RT 53-54.)

14  Munoz ordered Petty to stand up, walk backwards to the sallyport, and get off the yard.  (RT

15  54.)  As Petty got up, Munoz saw a pool of blood forming underneath him, and observed blood on

16  his face.  (RT 54.)  These injuries were not observed prior to Petty entering the yard.  (RT 55.)

17  Munoz next ordered Petitioner off the yard.  (RT 56.)  As he was leaving the yard, Munoz

18  observed Anderton, who had been down on the ground in a prone position, crawl on his belly

19  approximately three or four feet, pick something up, and throw it to Sprout.  Sprout at this time was

20  near the toilet.  (RT 57.)  Sprout picked up the object thrown by Anderton and put it in the toilet.

21  (RT 58.)  Another officer, officer Curry, turned off the water so that toilet would not flush.  (RT 58.)

22  After all the inmates were removed from the yard, officers searched the yard area and found

23  an inmate-manufactured weapon inside the yard drain.  (RT 71, 109-110, 124.)  The weapon was less

24  2 1/4 inches in length, with a handle and a double-sided razor blade.  (RT 125-126.)

25  Petty was examined and given medical treatment.  (RT 131-132.)  He was heavily bleeding

26  from an open double laceration extending from the bridge of his nose to the side of his ear, that

27  slashed all the way through the flesh and separated his cheek.  (RT 132-134.)  The two parallel cut

28  lines appeared to have been made by a single double-bladed instrument.  (RT 134-135.)  In addition,

3

1    to the laceration to his face, Petty suffered and was treated for five stab wounds punctured to his

2    chest and back.  (RT 136-138.)

3    <u>Defense</u>

4           Inmate Scott Petty testified that on the morning of March 5, 1998, he found an inmate

5    manufactured weapon, consisting of two razor blade pieces, lying on the exercise yard near the

6    checker-board area.  (RT 214-215.)  In an attempt to get it off the yard, he picked it up and started to

7    carry it over to the toilet.  (RT 216.)  He stopped at the handball game and held the weapon in his

8    right hand waiting for a break in the game to pass.  (RT 216-217.)  As he was standing and waiting,

9    someone came up behind him, and put an arm around his neck.  (RT 217.)  Petty instinctively reacted

10   by brining up his right hand to defend himself, and accidentally cut his face with the weapon he was

11   holding.  (RT 217-218.)

12          Another inmate, Ira Melanthy, testified that he was one of the inmate's playing handball, and

13   he observed the entire incident.  (RT 227-229.)  Petty asked Melanthy what the score was, which is

14   what an inmate would do if he wanted to cross the court to use the toilet, and wanted to get an idea

15   of how long he would need to wait until the game would end.  (RT 231.)  Melanthy noticed that

16   Petty's hand was cupped, and he observed an object in Petty's hand.  (RT 232.)  He saw Sprout and

17   Petitioner approach Petty from behind - - Sprout from Petty's right side, and Petitioner from Petty's

18   left side.  (RT 231-233.)  Petitioner grabbed Petty around the neck, and tried to pull him backwards.

19   (RT 233.)  Petty began thrashing with his hands, trying to grab Petitioner's arm.  (RT 233.)  Sprout

20   looked like he was trying to knock something out of Petty's hand.  (RT 233.)  Petitioner said

21   something to the effect of "Get that away from him."  (RT 233-234.)  Melanthy then saw Sprout pick

22   something up, and run with it toward the toilet.  (RT 234.)

23          Co-defendant Brandon Sprout testified that on March 5, 1998, he did not carry any inmate-

24   manufactured weapons onto the yard.  (RT 253-255.)  While Sprout and Petitioner were seated at the

25   checker-board area, he heard someone say that inmate Petty had a weapon.  (RT 260.)  Sprout

26   testified that Petty had frequently talked about violence, and Sprout was afraid that Petty was going

27   to attack a Hispanic inmate.  (RT 259.)

28   ///

4

1   Sprout and Petitioner decided to take the weapon away from Petty, and approached him from

2   behind. (RT 260.) Sprout struck Petty with a clenched fist two or three times in an attempt to get

3   the weapon so that he could flush it down the toilet. (RT 257-258.) He then moved away, and

4   noticed that Petty still had the weapon. He returned and got the weapon, took it to the toilet, and

5   tried to flush it. (RT 257-258.) Although he did not notice it at the time, the weapon did not go

6   down the toilet drawn, but rather remained inside the bowl. (RT 258.)

7   Co-defendant Anderton later threw a black cap fired by the .37 millimeter launcher to him.

8   (RT 258.) Sprout put the cap in the toilet, but did not attempt to flush it, because the cap was not

9   contraband. (RT 258.) At that time, he noticed that the weapon he had earlier tried to flush was still

10   in the bowl. (RT 258.) He next removed the cap and weapon from the toilet and threw the weapon

11   through the metal grate over the yard drain, where it was subsequently found. (RT 258-259.)

12   Sprout testified that he did not stab Petty with any inmate-manufactured weapon, and did not

13   dispose of any such second weapon. (RT 261.) Sprout attested that Petty already had six puncture

14   wounds on his chest and back before he came out to the yard that day, inflicted by guards during an

15   altercation. (RT 280-285.)

16   Rebuttal

17   Correctional Officer Johnny Sandoval testified that he strip-searched inmate Petty on the

18   morning of March 5, 1998, prior to his release on the yard, and no injuries on his body were

19   observed. (RT 323.) When Petty came off the yard, his face was lacerated, he had puncture wounds,

20   and he was covered in blood. (RT 324.)

21   DISCUSSION

22   A.   Jurisdiction

23   Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

24   to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

25   the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

26   375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as

27   guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kings County

28   Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

5

1    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

2  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

3  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct.

4  586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97

5  F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

6  *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

7  to cases filed after statute's enactment).  The instant petition was filed after the enactment of the

8  AEDPA and is therefore governed by its provisions.

9  B.    Standard of Review

10    This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

11  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

12  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

13    The AEDPA altered the standard of review that a federal habeas court must apply with

14  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

15  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

16  not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

17  involved an unreasonable application of, clearly established Federal law, as determined by the

18  Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

19  determination of the facts in light of the evidence presented in the State Court proceeding." 28

20  U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

21  approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

22  1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

23  concludes in its independent judgment that the relevant state-court decision applied clearly

24  established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,

25  that application must be objectively unreasonable." Id. (citations omitted).

26    While habeas corpus relief is an important instrument to assure that individuals are

27  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

28  Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

1   conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

2   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

3   determinations must be presumed correct, and the federal court must accept all factual findings made

4   by the state court unless the petitioner can rebut "the presumption of correctness by clear and

5   convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

6   (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

7   1388 (9th Cir. 1997).

8   C.       Instructional Error

9       Petitioner contends that the giving of CALJIC 17.41.1 was coercive and subversive resulting

10   in a violation of his fifth and sixth amendment rights.

11       A challenge to a jury instruction solely as an error under state law does not state a claim

12   cognizable in a federal habeas corpus action.  See, Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

13   To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

14   instruction by itself so infected the entire trial that the resulting conviction violates due process.  See,

15   id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be

16   considered in the context of the instructions as a whole and the trial record. Id.  The court must

17   evaluate jury instructions in the context of the overall charge to the jury as a component of the entire

18   trial process. See, United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v, Kibbe,  431

19   U.S. 145, 154 (1977)).  Furthermore, even if it is determined that the instruction violated the

20   petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction

21   had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v.

22   Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and

23   injurious effect or influence in determining the jury's verdict.). See, Hanna v. Riveland, 87 F.3d

24   1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so

25   prejudicial that it will support a collateral attack on the constitutional validity of a state court's

26   judgment is even greater than the showing required to establish plain error on direct appeal." Id.

27   ///

28   ///

7

1    In rejecting Petitioner's claim on direct appeal, the Court of Appeal held as follows:

2         In the instant case, there is no way to ascertain what was or was not discussed
     during jury deliberations. Although this court has not yet addressed the validity of
3    this instruction in a published decision, we find no reason to undertake a lengthy
     analysis given the impending resolution of this issue by the Supreme Court. We
4    simply state that we find the instruction proper. In particular, we conclude that
     CALJIC No. 17.41.1 neither intrudes into a juror's deliberative thought process nor
5    eliminates jury secrecy. It does not address proper subjective or objective
     deliberation, whether collective or individual, and does not interfere with free and
6    open debate. Instead, it addresses only impermissible and objectively expressed
     refusals to deliberate, or breaches of duty by a juror. It is neither intrusive nor
7    coercive, and it simply reminds the jurors of their duty to decide the case before them
     on the basis of the evidence and the law as instructed by the court.
8         Were we to assume, for the sake of argument, that CALJIC No. 17.41.1 is in
     some manner deficient, defective, or erroneous, we find the instruction did not
9    prejudice [Petitioner] even under the more stringent federal standard of review
     expressed in *Chapman v. California* (1967) 386 U.S. 18, 24. Nothing in the record
10   demonstrates any dissension among the jurors. There was no report of a juror
     disregarding the law or refusing to deliberate. There was no indication of a holdout
11   juror or a deadlock. There were no questions suggesting the jury was confused about
     its responsibility or that it had trouble on the issue of guilt. A careful review of the
12   record reveals substantial evidence of guilt, and the jury obviously had no problems
     reaching a verdict. Moreover, appellants do not suggest, nor is it reasonable to
13   surmise, the jury found the law to be unjust either in theory or as applied under the
     facts of this case. The notion that jury nullification was a possibility in this case
14   defies common sense. (Citation omitted.)

15   (Respondent's Exhibit C, attached to Answer, at 11.)[1]

16        The Court of Appeal's opinion is not contrary to or an unreasonable application of clearly

17   established Supreme Court precedent, as there is no United States Supreme Court case establishing

18   that an instruction such as CALJIC 17.41.1 violates an existing constitutional right. See Brewer v.

19   Hall, 378 F.3d 952, 955-956 (9th Cir. 2004). As previously discussed, to warrant habeas relief,

20   Petitioner must demonstrate that the instruction so infected the entire trial that the resulting

21   conviction violates due process. Petitioner has not done so. Petitioner's argument is speculative and

22   conclusory in nature, and is not supported by the record. Conclusory allegations do not warrant

23   habeas relief. See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995) (holding that conclusory

24   allegations made with no reference to the record or any document do not merit habeas relief).

25   Petitioner is unable to demonstrate any act on the part of the jury which would suggest that the

26

27        [1] Subsequent to Petitioner's jury trial and the Court of Appeal's opinion, the California Supreme Court determined
     that CALJIC No. 17.41.1 should not be given in the future because it "creates a risk of unnecessary intrusion on the
28   deliberative process." People v. Engelman, 28 Cal.4th 436 (2002).

1  instruction so infected the entire trial so that his conviction violates due process.  Petitioner's claim

2  is without merit and must be denied.

3       To the extent Petitioner attempts to rely on the California Supreme Court's decision in

4  People v. Engelman, 28 Cal.4th 436 (2002) to discontinue the use of CALJIC 17.41.1 to demonstrate

5  that the Court of Appeal's opinion was contrary to or an unreasonable application of Supreme Court

6  precedent, it is without merit.  As stated in Brewer, although the California Supreme Court

7  determined that CALJIC 17.41. 1 should not be given, its holding only applied to future cases.  "It

8  did not find that the instruction violated an established federal constitutional right; indeed, it

9  explicitly stated that no such constitutional violation resulted from the instruction."  Brewer, at 957

10  (citing Engelman, 28 Cal.4th at 443.)  "The California Supreme Court's decision to eliminate

11  CALJIC 17.41.1 from the California courts' repertoire- - as wise as that decision may have been- -

12  does not make it a clearly established unconstitutional instruction."  Brewer, at 957.  Because the use

13  of CALJIC 17.41.1 nor the state court's determination was not contrary to or an unreasonable

14  application of Supreme Court precedent, Petitioner's claim must be summarily denied.

15  D.    Sufficient Evidence

16       Petitioner contends that there was insufficient evidence to establish his guilt beyond a

17  reasonable doubt of assault with a deadly weapon causing great bodily injury.  Specifically,

18  Petitioner contends there was not sufficient evidence to demonstrate that he possessed a weapon or

19  inflicted great bodily injury on the victim.  As noted by Respondent, Petitioner presented this claim

20  to the California Supreme Court through a petition for review which was denied.[2]  (Respondent's

21  Exhibits J & K, attached to Answer.)

22       The law on insufficiency of the evidence claim is clearly established.  The United States

23  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

24  federal court must determine whether, viewing the evidence and the inferences to be drawn from it in

25  the light most favorable to the prosecution, any rational trier of fact could find the essential elements

26

27  [2]  Because the California Supreme Court was the only court to review the claim and the petition was summarily denied, there is no state court determination addressing Petitioner's sufficiency of the evidence claim.  In such a circumstance, the Court undertakes an "independent review of the record." Riggs v. Fairman, 399 F.3d 1179 (9th Cir. 2005) (citing Greene

28  v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002).

1  of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency

2  claims are judged by the elements defined by state law.  Id. at 324, n. 16.

3       Here, the jury found Petitioner guilty of violating California Penal Code section 4501 and

4  12022.7.  California Penal Code section 4501 provides:

5          Every person confined in a state prison of this state except one
           undergoing a life sentence who commits an assault upon the person of
6          another with a deadly weapon or instrument, or by any means of force
           likely to produce great bodily injury, shall be guilty of a felony and
7          shall be imprisoned in the state prison for two, four, or six years to be
           served consecutively.

8

9  California Penal Code section 12022.7 requires that one personally inflict great bodily injury on

10  another.

11       Sufficient evidence supports Petitioner's conviction.  First, with respect to whether Petitioner

12  had a weapon, there was evidence that Petitioner was seen by an eyewitness, as well as video

13  surveillance tape making a slashing motion across the area of the victim's face.  (RT 50-52, 61.)

14  Petitioner continued to make slashing motions throughout the altercation.  (RT 52-55.)  After

15  Petitioner backed off the victim and was being removed from the yard, co-defendant Anderton

16  crawled on his belly and picked up something and threw it to co-defendant Sprout who deposited it

17  in the toilet.  (RT 57-58.)  The toilet however would not flush because officers had turned off the

18  water.  (RT 58.)  Later, in the vicinity of the toilet in a small drain, correctional officers found a

19  small weapon with a handle and a double-sided razor blade.  (RT 121-126.)

20       As Respondent submits, the jury could reasonably have concluded that the weapon Anderton

21  located right after Petitioner got up was formerly in Petitioner's possession.  The jury could further

22  reasonably have concluded that the weapon found was not Sprout's weapon as that weapon was

23  deposited in the toilet which was flushed at least twice.  (RT 52.)  In addition, the jury could

24  reasonably have concluded that Petitioner possessed a weapon because his slashing-type movements

25  ///

26  ///

27  ///

28  ///

1   - which only he made - were consistent with the victim's injury, and that the injury must have been

2   made by some sort of weapon.[3]

3        Second, with respect to great bodily injury, as a result of the altercation the victim suffered a

4   large slash-type laceration on his cheek which went from the bridge of his nose to the right side of

5   his ear. The wound was so deep it went all the way through his cheek. (RT 130-134.) As the victim

6   rose to leave the yard after the altercation, there was a pool of blood forming underneath him. (RT

7   54.) Further, Petitioner's shoes, socks, and boxer shorts were bloody as a result of the altercation.

8   (RT 123.) Thus, viewing the severity of the victim's injuries there is no doubt that the victim

9   suffered great bodily injury as a result of the assault.

10        The fact that the victim only suffered one major laceration to his face, does not support an

11   inference that Petitioner did not cause the injury. In his traverse, Petitioner argues that it is not

12   reasonable to conclude that Petitioner made the slashing motions for 35 seconds since the victim

13   only received one laceration. Petitioner further argues that correctional officer Munoz did not see

14   Petitioner with a weapon nor did he see how the victim suffered the laceration. However, as

15   previously stated, although officer Munoz did not specifically see Petitioner with a weapon, he did

16

17   _____

18       [3] On cross-examination, as Petitioner points out, officer Munoz was questioned about his written report regarding the incident in which he described both Petitioner and defendant Sprout's movements as striking and slashing to the victim's head and upper torso. (RT 85.) Specifically, officer Munoz was questioned as follows:

19          Q. [Defense counsel]: Didn't you, in fact, write in your report that Sprout closed the distance between himself and Petty and joined in with [Petitioner] in striking Petty with clenched fists and what appeared

20          to be slashing motions to Petty's head and upper torso areas?
       A. Yes, I did.

21          Q. But you didn't mean that to describe what Mr. Sprout was doing with his clenched fist?
       A. I was just kind of describing the attack in general.

22          Q. Okay. I just, in your report it says slashing and today you said stabbing and those seem to mean different things?

23          A. Uh-huh.
       Q. Am I safe in assuming the part about clenched fist is the way you still remember it, that Mr. Sprout had

24          a clenched fist?
       A. Yes.

25

26   (RT 86.)

27       This testimony is not inconsistent with officer Munoz's previous testimony that it was Petitioner, not Sprout who made the slashing motions, as the written report merely lumped both Petitioner and Sprout's actions together and spoke only

28   in general terms. Munoz's testimony at trial was clear that Petitioner made slashing motions, while defendant Sprout made stabbing motions. (RT 50-55.)

1   see Petitioner making slashing motions.  The fact that the victim only suffered one laceration to his

2   face as a result of the altercation is immaterial to whether there was sufficient evidence to find him

3   guilty of the assault.

4   E.      Prior Conviction Enhancement

5          Petitioner contends that his 1992 prior conviction is constitutionally invalid and was therefore

6   improperly used to enhance his current sentence.  Petitioner submits that he is simultaneously

7   attacking the validity of the 1992 conviction.

8          In Lackawanna County District Attorney v. Coss, 532 U.S. 394, 121 S.Ct. 1567 (2001), the

9   Supreme Court addressed whether: (1) 28 U.S.C. § 2254 provides a remedy when a current sentence

10  was enhanced based on an allegedly unconstitutional prior conviction for which the sentence has

11  expired; and (2) the extent to which the prior expired conviction may be challenged in attack on the

12  current sentence which it was used to enhance.  Pointing to its prior decision Daniels v. United

13  States, 532 U.S. 374, 121 S.Ct. 1578 (2001), addressing a motion under 28 U.S.C. § 2255, the

14  Supreme Court explained:

15          We held there [Daniels] that "[i]f . . . a prior conviction used to enhance a federal
         sentence is no longer open to direct or collateral attack in its own right because the
16       defendant failed to pursue those remedies while they were available (or because the
         defendant did so unsuccessfully), then that defendant may not collaterally attack his
17       prior conviction through a motion under § 2255." [citation omitted].  We now extend
         this holding to cover § 2254 petitions directed at enhanced state sentences.

18          We grounded our holding in Daniels on considerations relating to the need for finality
19       of convictions and ease of administration.  Those concerns are equally present in the §
         2254 context.  The first and most compelling interest is in the finality of convictions.
20       Once a judgment of conviction is entered in state court, it is subject to review in
         multiple forums. . . .

21          As we said in Daniels, "[t]hese vehicles for review . . . are not available indefinitely
22       and without limitation." [citation omitted].  A defendant may choose not to seek
         review of his conviction within the prescribed time.  Or he may seek review and not
23       prevail, either because he did not comply with procedural rules or because he failed to
         prove a constitutional violation.  In each of these situations, the defendant's
24       conviction becomes final and the State that secured the conviction obtains a strong
         interest in preserving the integrity of the judgment. [citation omitted].  Other
25       jurisdictions acquire an interest as well, as they may then use that conviction for their
         own recidivist sentencing purposes, relying on "the 'presumption of regularity' that
26       attaches to final judgments."  Parke v. Raley, 506 U.S. 20, 29, 121 L.Ed 2d 391, 113
         S.Ct. 517 (1992) . . .

27  Lackawanna, 532 U.S. at 403-404.

28  ///

12

1      The Supreme Court reiterated its holding that "once a state conviction is no longer open to

2  direct or collateral attack in its own right because the defendant failed to pursue those remedies while

3  they were available (or because the defendant did so unsuccessfully), the conviction may be regarded

4  as conclusively valid. . . . If that conviction is later used to enhance a criminal sentence, the

5  defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the

6  ground that the prior conviction was unconstitutionally obtained." Id.

7      On January 31, 2005, Petitioner filed a request for judicial notice, arguing that the instant

8  claim is not barred by Lackawanna.[4]  On April 7, 2005, Respondent filed a response to Petitioner's

9  request.

10      Petitioner argues that Lackawanna only bars review of a fully expired prior conviction.

11  Petitioner reasons that Lackawanna does not bar review if the Petitioner can demonstrate that he is

12  still in custody on his prior conviction.  (Req. for Jud. Not. at 7, Court Doc. 23.)  In essence,

13  Petitioner is arguing that because he is still serving time on his 1992 conviction his claim is not

14  barred.

15      Petitioner claims that the 1992 conviction "was obtained as a result of; ineffective assistance

16  of Counsel; conflict of interest; admitting un-Mirandized statements; admitting evidence of prior

17  assaults during rebuttal; a denial to cross-examine rebuttal witness about the new evidence; or to be

18  able to present a defense against the new allegations; Posecutarial [sic] misconduct; and the State

19  Appellate Court upholding the conviction without weighing the prejudicial effect beyond a

20  reasonable doubt." (Petition, at 9.)

21      Petitioner's argument is misplaced and without merit.  The determination is not whether

22  Petitioner is still serving time on the prior conviction, but rather whether the conviction is still

23  subject to review in its own right.  As Respondent submits, Lackawanna described a fully expired

24  prior conviction as "no longer open to direct or collateral attack in its own right because the

25  defendant failed to pursue those remedies while they were available." Lackawanna, 532 U.S. at 402.

26  Here, Petitioner's predicate prior occurred in 1992.  Petitioner attempted to collaterally attack that

27

28     [4] As previously stated, pursuant to the Court's order of March 9, 2005, the Court construed Petitioner's request as a supplement to the traverse.  (Court Doc. 24.)

13

1   prior conviction in this Court.  (Respondent's Exhibit A, attached to Court Doc. 25, Docket Sheet for

2   Case No. CV-F-03-6012 TAG HC; see also CV-F-03-6012 TAG HC, Petition, at Court Doc. 1.)

3   This Court dismissed the action as untimely.  (Respondent's Exhibit B (Order granting Respondent's

4   motion to dismiss, dismissing the petition as untimely, and directing the clerk to enter judgment); see

5   also CV-F-03-6012 TAG HC, Court Doc. 22.)   Specifically, Petitioner's direct appeal process on the

6   predicate prior became final prior to the enactment of the AEDPA on April 24, 1996.  Petitioner had

7   one year from the date of enactment to file his federal petition, plus any statutory and equitable

8   tolling.  However, Petitioner did not file any collateral actions during this one-year grace period, and

9   the statute of limitations expired on April 24, 1997.  Petitioner did not file his first collateral action

10  until September 24, 2002, more than five years after the statute of limitations expired.

11  (Respondent's Exhibit B, at 3-5.)

12        There is a limited exception to the Lackawanna rule; however, Petitioner does not, nor can

13  he, claim that there was a failure to appoint counsel.  Lackawanna, 532 U.S. at 406.  Although it may

14  be true that Petitioner is still serving time on his 1992 prior conviction, this does not support a

15  finding that he can directly challenge that conviction, as Petitioner simply overlooks the limitations

16  period placed upon such a challenge.  Therefore, Petitioner's claim is barred and without merit.

17                                   RECOMMENDATION

18        Based on the foregoing, it is HEREBY RECOMMENDED that:

19        1.    The petition for writ of habeas corpus be DENIED; and

20        2.    The Clerk of Court be directed to enter judgment in favor of Respondent.

21        This Report and Recommendation is submitted to the assigned United States District Court

22  Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local

23  Rules of Practice for the United States District Court, Eastern District of California.  Within thirty

24  (30) days after being served with a copy, any party may file written objections with the court and

25  serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's

26  Report and Recommendation."  Replies to the objections shall be served and filed within ten (10)

27  court days (plus three days if served by mail) after service of the objections.  The Court will then

28  review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:     April 25, 2005**                         **/s/ Sandra M. Snyder**
icido3                                   UNITED STATES MAGISTRATE JUDGE